UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHELBY KLEIN,<br><br>    Plaintiff,<br><br>  v.<br><br><br>SAFELITE GROUP, INC. D/B/A<br>SAFELITE AUTOGLASS,<br><br>    Defendant. | Hon. Joseph H. Rodriguez<br><br>Civil No. 16-726 (JHR/JS)<br><br>OPINION |

This matter is before the Court on motion of Defendant Safelite Group, Inc. for summary judgment pursuant to Fed. R. Civ. P. 56. The Court heard oral argument on June 13, 2018 and the record of that proceeding is incorporated here by reference. For the reasons given during argument and those articulated below, Defendant's motion will be granted.

## Background

Plaintiff Shelby Klein brought this lawsuit against her former employer Defendant Safelite Fulfillment, Inc. (incorrectly captioned as "Safelite Group, Inc. d/b/a Safelite Autoglass") asserting pregnancy discrimination under the New Jersey Law Against Discrimination ("NJLAD") and retaliation under the Family and Medical Leave Act ("FMLA"), as well as violations of the Equal Pay Act of 1963 and Lilly

Leadbeater Fair Pay Act of 2009. Through the instant motion, Defendant seeks summary judgment, arguing that Plaintiff was terminated on August 10, 2015 after years of poor performance as a store manager because she continued to perform poorly after being placed on a performance improvement plan.

Plaintiff began employment with Defendant in May of 1997 as a Customer Service Representative. She was promoted to Store Manager at Defendant's Pleasantville, New Jersey location in October of 2007. As Store Manager, Plaintiff was responsible for overseeing the daily operations of the employees at her store, inventory and payroll for her store, hiring and firing, providing high levels of customer service, developing and engaging her team, and ensuring that key performance indicators (KPIs) met or exceeded company goals.

One KPI is the Net Promoter Score ("NPS") which is a percentage that gauges customer delight based on surveys that are sent to customers—the higher percentage, the better. Defendant's minimum acceptable NPS is 87%. Another KPI is the employee engagement score which is based on People Opinion Surveys administered by a third-party. All associates fill out the People Opinion Surveys about their managers and the minimum acceptable engagement score is 85%. Another KPI is the Customer Service

Tracking ("CST") Quality score which measures the quality of the work that Technicians do on the job. Defendant's maximum acceptable CST Quality Store is 1.8%. The figure measures the quality of workmanship Technicians from a site perform by tracking any damages or other work that needs to be re-done after customer complaints.

Defendant maintains that Plaintiff demonstrated performance deficiencies as early as 2011. On Plaintiff's 2011 Performance Review, her supervisor at the time, Joe Vance, noted that Plaintiff had the worst NPS score in the Philadelphia Market. Vance also noted that Plaintiff fell short on budgeting goals and numerous KPIs and needed to make sure that her associates were getting the proper training and performing effectively on a daily basis.

In October of 2012, Keenan McCafferty became Operations Manager and Plaintiff's new direct supervisor. McCafferty testified that because he was new to the role and had limited personal knowledge of the Store Managers' performance, he gave all Store Managers in the Philadelphia Market including Plaintiff a rating of "meets expectations" on their 2012 reviews.

However, Plaintiff's KPIs dropped from 2012-2013. Throughout 2013, McCafferty had conversations with Plaintiff about her store's poor

performance and KPIs. On her 2013 annual review, McCafferty noted Plaintiff's low NPS score, high CST Quality score, failure to make budget, missing and unaccounted-for inventory, and poor employee engagement. Plaintiff's 2013 People Opinion Survey revealed a decline in her employee approval rating from 70% in 2012 to 50% in 2013; her Performance Excellence Index dropped from 79% in 2012 to 69% in 2013 and Consumer focus dropped from 81% to 69%.

In or around April of 2014, McCafferty moved into the District Manager position and Sambath Lok became the Operations Manager and Plaintiff's new direct supervisor. Similar to McCafferty, when Lok entered the Operations Manager role, he wanted to give all of his Store Managers a clean slate. However, by the middle of 2014, Lok had serious concerns regarding multiple areas of Plaintiff's performance that needed to be improved. Lok noticed that Plaintiff had missing and unaccounted-for inventory and had multiple discussions with her regarding this issue.

By this time, Plaintiff had become pregnant. She testified that in July or August of 2014, Lok made a comment about her hormones. Specifically, Plaintiff testified that Lok asked her if it was Plaintiff's "hormones talking" in response to a statement about Lok's tendency to visit her store despite

telling Plaintiff that he would not be there on that given day. Plaintiff reported the comment to McCafferty.

Despite Lok's verbal coaching, Plaintiff's October 2014 inventory was again unacceptable. Plaintiff's store was also experiencing numerous quality issues in 2014, as there was an excessive amount of damages occurring to customers' vehicles. Plaintiff allegedly was failing to make sure that her Technicians had the right tools and equipment for their mobile jobs. Additionally, Lok observed engagement issues with Plaintiff's associates. Lok received numerous complaints from associates in Plaintiff's store, which experienced significant turnover in 2014 in that at least six Technicians left Plaintiff's store either voluntarily or involuntarily.

Plaintiff was the only Store Manager in the Philadelphia Market to receive an overall rating of "4- does not meet expectations" on the 2014 annual review. Plaintiff's 2014 review noted her unacceptable NPS and CST Quality scores as well as her failure to competently control expenses. Lok stated on Plaintiff's annual review that she had more below average results in 2014 and KPIs that did not meet or exceed Company standards. Lok testified that Klein was in need of significant improvement before leaving on maternity leave, and he had expressed as much to her through verbal coaching.

In November of 2014, Plaintiff requested and received 12 weeks of maternity leave under the FMLA, from November 17, 2014 through February 18, 2015. After giving birth, Plaintiff did not experience any lingering medical conditions relating to her past pregnancy or childbirth.

The results of Plaintiff's 2014 People Opinion Surveys came out while Plaintiff was out on her leave of absence and revealed the Plaintiff's engagement score dropped further from 50% in 2013 to 44% in 2014. Plaintiff was placed on a performance improvement plan ("PIP") which was delivered to her two days after she returned from her leave of absence.

Lok continued to provide Plaintiff with verbal coaching after issuing her the PIP. Employee engagement issues continued in 2015, however, and another four associates in Plaintiff's store voluntarily left their employment and a fifth associate announced that he was quitting. While Plaintiff was out on maternity leave, her store's KPIs improved but they dropped again once Plaintiff returned to work.

Given the continued turnover and Plaintiff's failure to improve her KPIs, Lok recommended to McCafferty that Defendant separate her employment; McCafferty agreed. In consultation with Regional People Business Partner Greg Byrd, McCafferty made the ultimate decision to terminate Plaintiff's employment effective August 10, 2015.

Management's decision and reasoning was reflected in an email from

McCafferty approximately a month before Plaintiff returned from leave:

From:       McCafferty, Keenan
Sent:       Tuesday, July 14, 2015 4:52 PM
To:         Byrd, Greg
Cc:         Laski, Jonathan; Lok, Sambath
Subject:    Shelby Klein

Greg,

Here is the information you asked me to put together.  I also put
last year's numbers into the worksheet.  As far as this year her
NPS isn't the lowest however she was on maternity leave in Jan
and Feb.  The scores for those 2 months were 88.8 and 92.7.
Since her return this location has been dropping in NPS every
month and they had the lowest CSTQ for the first 2 months of
the year as well.  Now they are at the bottom in CST since her
return.  As you know her engagement for the past 2 years have
been extremely low.  In 2014 her score was 50% and in 2015 it
went down to 30%.  We put her on a PIP this year and were
going to pulse survey in July but in looking at her numbers and
also feedback we are getting from technicians in her store they
feel she is aggressive and really doesn't want to hear them.  We
have also sent multiple techs to her location from other stores
in our market and they all say they don't want to go back down
there if they don't have to.  They seem to feel as though there is
no team work nor commitment from Shelby.  We also have
managers and people within our market who have said aloud
they don't understand why she is still here.  The managers feel
that the Pleasantville Location at times keeps the entire market
from hitting certain sales goals.  What also has been frustrating
to the market is that when we move resources down to help the
location her techs all call out of work and the help that was sent
down gets stuck trying to get all the additional work done or
possibly have to reschedule customers.

It is mine and Sam's feeling that Shelby has gone as far as she
can in her management career.  We have lost many techs out of

that location in the past 2 years and we can't continue the same pattern with losing our people.

Keenan

(Safelite000107.)

After briefing was completed on the instant motion, and well after the close of discovery, Plaintiff was granted leave to supplement the record with a certification from Defendant's former employee, Greg Manning, who also has brought suit against Safelite and a certification from another former employee, Nicholas Walters, who sought to join Manning's suit but was denied. Manning stated,

> During the time of my employment I heard Sam Lok make comments about Shelby Klein and her position as store manager of the Pleasantville location. These comments included Mr. Lok saying that he did not believe women should be in the position of manger because they did not know how to do the work themselves. After she became pregnant, I recall Mr. Lok saying that her becoming pregnant is why women should not be in management, she is going to be out for a long period of time and she's going to leave the company shorthanded.

(Manning Cert. ¶ 2-4.) Walters stated,

> I was privy to conversations concerning Shelby Klein made by Sambath Lok and Keenan McCafferty. Shortly after Shelby Klein went on maternity leave it was stated that Ms. Klein would need to be terminated, but they wanted to wait until she returned so it would not seem as if she was being fired for maternity leave.

(Walters Cert. ¶ 2-3.)

Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (a). Thus, the Court will enter summary judgment in favor of a movant who shows that it is entitled to judgment as a matter of law, and supports the showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party.

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex</u>, 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. <u>Id.</u>; <u>Maidenbaum v. Bally's Park Place, Inc.</u>, 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. <u>Anderson</u>, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" <u>Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs</u>, 982 F.2d 884, 890 (3d Cir. 1992) (quoting <u>Quiroga v. Hasbro, Inc.</u>, 934 F.2d 497, 500 (3d Cir. 1991)). Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

<u>Celotex</u>, 477 U.S. at 322. That is, the movant can support the assertion that a fact cannot be genuinely disputed by showing that "an adverse party cannot produce admissible evidence to support the [alleged dispute of]

fact." Fed. R. Civ. P. 56(c)(1)(B); accord Fed. R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the factfinder. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

NJLAD

Generally

"Title VII prohibits employers from engaging in discrimination on the basis of race, color, religion, sex or national origin." Atkinson v. LaFayette College, 460 F.3d 447, 453-54 (3d Cir. 2006) (citing 42 U.S.C. § 2000e–2). Pursuant to the Pregnancy Discrimination Act ("PDA"), an amendment to Title VII, discrimination on the basis of sex includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 363-64 (3d Cir. 2008) (quoting 42 U.S.C. § 2000e(k)).

"Analysis of a claim under the NJLAD follows that of a claim under Title VII." Teubert v. SRA International, Inc., 192 F. Supp. 3d 569, 574 (D.N.J. 2016) (citing Schurr v. Resorts Intern. Hotel, Inc., 196 F.3d 486,

498 (3d Cir. 1999)). As such, New Jersey has adopted the burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), as the starting point in circumstantial evidence discrimination actions brought under its Law Against Discrimination. <u>Andersen v. Exxon Co., U.S.A.</u>, 446 A.2d 486, 490-91 (N.J. 1982). Though the <u>McDonnell Douglas</u> framework is followed in cases of discriminatory discharge, the elements of the prima facie case are modified to fit the circumstances. <u>Clowes v. Terminix Int'l, Inc.</u>, 538 A.2d 794, 805 (N.J. 1998); <u>Bell v. K.A. Indus. Services, LLC</u>, 567 F. Supp. 2d 701, 706 (D.N.J. 2008).

Once the employee has satisfied her burden of establishing a prima facie case of discrimination under the LAD, the burden of production then shifts to the employer to rebut the prima facie case by "articulat[ing] some legitimate, nondiscriminatory reason" for its alleged unlawful action. <u>Clowes</u>, 538 A.2d at 805; <u>see</u> <u>also</u> <u>Laresca v. AT&T</u>, 161 F. Supp. 2d 323, 335 (D.N.J. 2001). An employer has a legitimate, nondiscriminatory reason to terminate an employee where their performance does not meet company standards. <u>See, e.g.</u>, <u>Brewer v. Quaker State Oil Ref Corp.</u>, 72 F.3d 326, 330 (3d. Cir. 1995) (holding employer had legitimate, non-discriminatory reasons to terminate plaintiff because plaintiff had

continuous performance problems, including poor follow-up on customer requests and poor communications with clients and with management).

"In order to defeat a summary judgment motion if the employer answers the plaintiff's prima facie case with [a] legitimate, nondiscriminatory reason[ ] for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Laresca, 161 F. Supp. 2d at 335-36; accord Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1067 (3d Cir. 1996).

In evaluating employment cases, the task of the court is not to second-guess employment decisions but is instead to determine whether the employment decisions were motivated by an illegal discriminatory purpose. Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 525-27 (3d Cir. 1992). Thus, to establish pretext, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.  Rather, the non-moving plaintiff must demonstrate such weakness,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer' did not act for [the asserted] nondiscriminatory reasons." Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (quoting Ezold, 983 F.2d at 531; Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993)).

Pregnancy Discrimination

To establish a prima facie case of discrimination based on pregnancy, a plaintiff must show (1) she was pregnant and the defendant knew that fact, (2) she was qualified for her job, (3) she suffered an adverse employment decision, and (4) there was "some nexus between her pregnancy and the adverse employment action." C.A.R.S. Protection Plus, 527 F.3d at 365. "While some effects of pregnancy linger beyond the act of giving birth, at some point the female employee is no longer 'affected by pregnancy, childbirth, or related medical conditions,' for purposes of the PDA." Kenney v. Ultradent Prod., Inc., No. 05-1851, 2007 WL 2264851 at *5 (D.N.J. Aug. 6, 2007) (finding lack of temporal nexus to establish prima facie case of pregnancy discrimination where plaintiff was terminated 535 days after returning from maternity leave) (citing Solomen v. Redwood

Advisory Co., 183 F. Supp. 2d 748, 753 (E.D. Pa. 2002) (quoting 42 U.S.C. § 2000e(k) in holding that plaintiff failed to establish protected class status where she was terminated 11 months after childbirth)). See also Brinkman v. Kansas Dep't of Corrections, 863 F. Supp. 1479, 1486 (D. Kan. 1994) (finding that plaintiff who was terminated 9 months after childbirth failed to establish protected class status under PDA). But see Rymas v. Princeton Healthcare Sys. Holding, Inc., No. 15-8188, 2017 WL 4858123, *6 (D.N.J. Oct. 27, 2017) (finding that a reasonable jury could conclude sufficient temporal proximity where plaintiff was terminated 50 days after returning from maternity leave).

"To be a member of the protected class when no longer within temporal proximity to either pregnancy or childbirth, the plaintiff must do more than 'show she was, past tense, pregnant.'" Kenney, 2007 WL 2264851, at *5 (quoting Solomen, 183 F. Supp. 2d at 754). "The plaintiff must have evidence that at the time of the adverse employment action she had a medical condition related to either the pregnancy or childbirth." Id. (quoting Solomen, 183 F. Supp. 2d at 754).

In this case, Plaintiff returned to work February 18, 2015 with no lingering medical conditions related to childbirth. She was terminated 173 days after returning to work, about 9 months after giving birth. She has not

established a sufficient temporal nexus between her pregnancy and her termination to establish a prima facie case of pregnancy discrimination under the NJLAD.

Even if Plaintiff could show a prima facie case under the NJLAD, her continued poor performance was a legitimate, non-discriminatory reason for her discharge. Her performance issues arose and were documented years prior to her becoming pregnant. Plaintiff received annual reviews that identified numerous areas of deficiency, and her scores were not meeting company standards. In addition, the comment allegedly made by Lok to the effect that Plaintiff's hormones were talking fails to establish that Defendant's reasons for terminating Plaintiff were pretext for pregnancy discrimination. Stray remarks by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision. See, e.g., Ezold, 983 F.2d at 545.

Summary judgment will be granted on the claim of pregnancy discrimination and the separate count for punitive damages under the NJLAD.

## The Family and Medical Leave Act

### Generally

The Family and Medical Leave Act of 1993, 29 U.S.C. § 2601,
("FMLA") was enacted to provide leave for workers whose personal or
medical circumstances require that they take time off from work in excess
of what their employers are willing or able to provide. Victorelli v.
Shadyside Hosp., 128 F.3d 184, 186 (3d Cir. 1997) (citing 29 C.F.R. §
825.101). The Act is intended "to balance the demands of the workplace
with the needs of families . . . by establishing a minimum labor standard for
leave" that lets employees "take reasonable leave for medical reasons, for
the birth or adoption of a child, and for the care of a child, spouse or parent
who has a serious health condition." Churchill v. Star Enters., 183 F.3d 184,
192 (3d Cir. 1999) (quoting 29 U.S.C. § 2601(b)(1), (2)).

The FMLA guarantees eligible employees 12 weeks of leave in a one-
year period following certain events: a serious medical condition; a family
member's serious illness; the arrival of a new son or daughter; or certain
exigencies arising out of a family member's service in the armed forces.  29
U.S.C. § 2612(a)(1). Leave must be granted, when "medically necessary," on
an intermittent or part-time basis. § 2612(b)(1). Upon the employee's
timely return, the employer must reinstate the employee to his or her

former position or an equivalent. § 2614(a)(1). Although employers may adopt or retain leave policies more generous than any policies that comply with the requirements under the FMLA, 29 U.S.C. § 2653, the "rights established by the Act may not be diminished by any employment benefit program or plan," 29 C.F.R. § 825.700.

The Act makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of" these rights, § 2615(a)(1); to discriminate against those who exercise their rights under the Act, §  2615(a)(2); or to retaliate against those who file charges, give information, or testify in any inquiry related to an assertion of rights under the Act, §  2615(b). An employer also cannot "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions." Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 159-60 (3d Cir. 1998) (quoting 29 C.F.R. § 825.220(c)). But where an employee is discharged during a protected leave for a reason unrelated to the leave, there is no right to reinstatement. Conoshenti v. Public Service Elec. & Gas Co., 364 F.3d 135, 141 (3d Cir. 2004) (citing 29 C.F.R. § 825.216(a)(1)).

Retaliation

In cases alleging retaliation in the employment setting, courts generally apply the familiar burden-shifting framework established in

McDonnell Douglas, 411 U.S. 792.  See Weston v. Pennsylvania, 251 F.3d 420, 432 (3d Cir. 2001).  Again, the first step under McDonnell Douglas is to establish a prima facie case of retaliation for requesting FMLA leave. 411 U.S. at 802. "To prevail on a retaliation claim under the FMLA, the plaintiff must prove that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 301-02 (3d Cir. 2012).

To establish causation, a plaintiff "must point to evidence sufficient to create an inference that a causative link exists between her FMLA leave and her termination." Id. at 307. A causal connection may be established by circumstantial evidence, such as temporal proximity, a pattern of antagonism, and pretext. Kachmar v. SunGard Data Sys., 109 F.3d 173, 177 (3d Cir. 1997). This indirect evidence is to "be considered with a careful eye to the specific facts and circumstances encountered." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279, n.5 (3d Cir. 2000). "Retaliation need not be the sole reason motivating the adverse employment decision; rather, it will suffice for the plaintiff to show that the retaliatory animus was a determinative factor, i.e., that the action would not have been taken but for the protected activity.'" Hall-Dingle v. Geodis Wilson USA, Inc., No. CV 15-

19

1868, 2017 WL 899906, at *8 (D.N.J. Mar. 7, 2017) (internal quotations omitted).

Once a prima facie case is established, the burden of persuasion shifts back to the defendant to put forth "a legitimate, nondiscriminatory reason" for the employment decision. Id.; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). If the defendant succeeds in demonstrating that the decision was based on a non-discriminatory reason, the plaintiff has the burden of proving by a preponderance of the evidence that the stated reason was pretextual. Burdine, 450 U.S. at 260; St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 508 (1993).

"[F]iring an employee for [making] a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee." Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009). On the other hand, an employer is not required to suspend its termination proceedings just because the employee requests medical leave. See, e.g., Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001). "A contrary holding might impede employers from permissible terminations and encourage employees aware of an impending termination to attempt to create their own 'severance package.'" Windfelder v. The May Dep't Stores Co., 93 F. App'x 351, 355 (3d Cir. 2004).

In this case, while Plaintiff was placed on a PIP just two days after returning from FMLA leave, her performance issues arose and were documented years prior to her taking leave. Plaintiff received annual reviews that identified numerous areas of deficiency, and her scores were not meeting company standards. Plaintiff's continued poor performance was a legitimate, non-discriminatory reason for her discharge which Plaintiff has not shown to be pretext for FMLA retaliation.

## Equal Pay Act

To establish a prima facie case under the EPA, Plaintiff must demonstrate that employees of the opposite sex within the same establishment were paid differently for performing "equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1); Johnson v. Fed Ex Corp., 604 F. App'x 183, 187 (3d Cir. 2015). Pay differentials based on merit, quantity, or quality of production, or another factor than sex, are permitted under the EPA. 29 U.S.C. § 206(d). Such acceptable factors include "education, experience, prior salary, or any other factor related to performance of the job." Puchakjian v. Twp. Of Winslow, 804 F. Supp. 2d 288, 295 (D.N.J. 2011).

Plaintiff has alleged a violation of the Equal Pay Act based solely on gender and tenure with the Defendant. However, "Safelite uses a merit system to make annual salary adjustments for Store Managers. Specifically, a Store Manager's store volume, *i.e.* sales, units averaged daily, quality of service, number of Technicians, employee engagement, and other key performance indicators ("KPIs") affect a Store Manager's annual compensation." (McCafferty Decl. ¶ 2.) At the time of Plaintiff's termination, three male Store Managers in the Philadelphia Market, Marcel Santiago, Bogdan Kril, and Andrey Skorobagatko, and one female Store Manager, Donna Culp, were earning more money than Plaintiff. Plaintiff earned more than two male Store Managers in the Philadelphia Market, Tim Johnson and David O'Donnell. In 2014, Plaintiff was the only Store Manager in the region to have received a "does not meet expectations" on the annual review and the only Store Manager on a PIP. Plaintiff has failed to show that she performed work of equal skill, effort, and responsibility to the other Store Managers. Summary judgment on the EPA claim will be granted.

<u>Conclusion</u>

For the reasons stated above, and in keeping with the discussion held on the record during oral argument, Defendant's motion for summary judgment will be granted. An Order will accompany this Opinion.

Dated: June 25, 2018                         <u>/s/ Joseph H. Rodriguez</u>
                                             Joseph H. Rodriguez, USDJ